IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TIMOTHY WADE JONES,**

      **Plaintiff,**

v.                                             Civil Action No. 2:07cv6
                                                   (Judge Maxwell)

**DR. J. HAMMOND, DR. J. TENNANT,
DR. T. WARREN, DR. BRANSON,
KIMBERLY WHITE, AL HAYNES,
HARRELL WATTS, A. GERBER,**

      **Defendants.**

## OPINION/REPORT AND RECOMMENDATION

### I. Factual and Procedural History

The *pro se* plaintiff initiated this civil rights action on January 25, 2007, by filing a civil rights complaint against the above-named defendants pursuant to <u>Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971). In the complaint, the plaintiff alleges that the defendants violated his constitutional rights by denying him appropriate mental health treatment.

On October 31, 2007, the undersigned conducted a preliminary review of the complaint and recommended that the plaintiff's claims against defendants White, Haynes, Watts and Gerber be dismissed. In addition, the undersigned recommended that the plaintiff's claims against defendants Hammond, Tennant, Warren and Branson proceed, and that those defendants be made to answer the complaint. On February 6, 2008, the Honorable Robert E. Maxwell, United States District Judge adopted the undersigned's recommendation in its entirety. Thus, defendants White, Haynes, Watts

and Gerber were dismissed and defendants Hammond Tennant, Warren and Branson were directed to file an answer to the complaint.

## II. The Contentions of the Parties

### A. The Complaint

In the complaint, the plaintiff asserts that the defendants have denied him proper mental health treatment. Specifically, the plaintiff asserts that he has been denied treatment and evaluation with regard to his bipolar disorder, anxiety disorder, personality disorder, antisocial disorder, chronic depression and mood disorder. In support of his claim, the plaintiff asserts that upon his arrival at USP-Hazelton, where the defendants are employed, he has discussed his need for mental health treatment with the defendants and others. The plaintiff asserts however, that the defendants have shown a wanton indifference toward his mental health needs. The plaintiff further asserts that his mental health issues were documented by the sentencing court and can be verified by his past medical records. The plaintiff believes he needs to be incarcerated at a federal medical facility and that the defendants have refused to transfer him to such a facility for financial reasons.

### B. The Defendants' Motion to Dismiss or for Summary Judgment

In response to the complaint, the defendants assert that the plaintiff is not entitled to relief for the following reasons:

(1) Dr. Tennant is a Public Health Service Employee and thus, immune from liability under Bivens;

(2) the plaintiff has failed to establish that the defendants were deliberately indifferent to his serious medical needs;

(3) the defendants are entitled to qualified immunity; and

(4) the plaintiff's request for injunctive relief should be denied as this Court does not have the authority to designate the plaintiff's place of confinement.

**C.   The Plaintiff's Opposition to the Defendants' Motion**

In his response to the defendants' motion, the plaintiff asserts that his medical history will show a long list of treatment for mental conditions. The plaintiff suggests that if the defendants had reviewed such documentation, his mental condition would have been properly assessed and his medications would never have been taken away. The plaintiff asserts that the defendants have deliberately ignored his medical history and taken away his medications through unscientific and improper procedures. The plaintiff asserts that the defendant's failure to provide him certain medications for his bipolar disorder, namely lithium, has caused him physical harm. The plaintiff insists that he exhibited signs of bipolar disorder while incarcerated at USP-Hazelton that were ignored by the defendants. Moreover, the plaintiff asserts that the defendants simply refused to believe his complaints and thus, never conducted the proper tests to see if he was in fact, bipolar or suffering from any other mental condition.

### III.   Standard of Review

**A.   Motion to Dismiss**

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations. Advanced Health-Care Services, Inc., v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990). Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Conley

3

v. Gibson, 355 U.S. 41, 45-46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**B.    Motion for Summary Judgment**

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson at 256. The "mere existence of a scintilla of evidence" favoring

4

the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

## IV. Analysis

### A. Deliberate Indifference to Serious Medical Needs

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment "cruel and unusual punishment" claim, a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a lifelong handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. Wilson, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial of nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A mere disagreement between the inmate and the prison's medical staff as to the inmate's diagnosis or course of treatment does not support a claim of cruel and unusual punishment unless exceptional circumstances exist. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

According to the defendants, the plaintiff's medical records show the following with regard to the claims raised in the complaint:

> Plaintiff was seen by psychology staff at the Federal Correction Institution in Waseca, Minnesota (FCI Waseca) pursuant to a court order for a study to determine Plaintiff's sanity at the time he allegedly committed a Bank Robbery, the crime for which he is now incarcerated. Forensic Psychologist Dr. Brandt generated a report on September 30, 2004, which detailed the offense as well as Mr. Jones' medical and personal history. Dr. Brandt determined that the most appropriate diagnosis in Mr. Jones' case was Polysubstance Dependence, Rule Out Bipolar Disorder, NOS (Not Otherwise Specified), and Personality Disorder NOS with Antisocial and Borderline Traits. A "rule out" diagnosis does not in fact diagnose that patient with the disorder. Rather, it indicates that the patient

should be further assessed to determine the appropriateness of a bipolar diagnosis. Dr. Brandt expressed her clinical opinion that Mr. Jones was not in fact suffering from Bipolar Disorder.

On May 24, 2005, immediately after arriving at USP Hazelton, Plaintiff was seen in Receiving and Discharge due to his psychology alert status, which is given to all inmates participating in a study, such as that done at FCI Waseca. That status alerts the receiving institution to evaluate the inmate to determine if the status should be continued. Plaintiff was calm and alert and reported a history of bipolar disorder and medication, including lithium and Paxil. Based on this assessment, the psychology alert status was discontinued.

Plaintiff's intake screening took place on May 31, 2005, and was performed by Staff Psychologist Dr. Tennille Warren. Dr. Warren conducted an introductory review of Plaintiff's medications and medical history. This review is done with each inmate as he enters the facility in order to ensure the inmate receives the appropriate medications. Dr. Warren noted that Plaintiff claimed a history of bipolar disorder and also believed he had further disorders. Plaintiff reported use of lithium, Paxil, and dioxipin and requested a psychiatric evaluation to change his medication. Plaintiff also reported a history of substance abuse, with cocaine as his drug of choice. Plaintiff was provided with information about available programming options for drug treatment. He denied being either a victim or perpetrator of sexual abuse. He denied past or present homicidal ideation and admitted suicidal ideation but denied any attempts. Based on this information, Dr. Warren noted a follow up would be provided.

Dr. Hammond met with Plaintiff on June 9, 2005 after complaints from Unit Team that Plaintiff was demanding attention. Dr. Hammond recommended a review of Plaintiff's medications and scheduled him for a psychiatric consult for June 22, 2005.

Pursuant to a letter Plaintiff submitted to his Case Manager that read "I hate my life and my world more and more each day," Dr. Warren met with Plaintiff on June 14, 2005. Her notation in the PDS was based on previous PDS entries, a clinical interview with Plaintiff, and data from Health Services, the Unit Team and SENTRY. Dr. Warren noted that Plaintiff was cooperative, coherent, logical, and goal oriented. She used the Jail Suicide Assessment Tool to assess Plaintiff and found neither suicidal thoughts, plans, nor intentions

were present. Dr. Warren noted that Plaintiff had been at the institution for three weeks and had seen a psychologist three times, had his psychotropic medications evaluated per his request, and denied any interest in the psychology groups available at USP Hazelton. Dr. Warren further educated Plaintiff about the types of psychological services available at the institution and recommended that he take part in them. However, Plaintiff was still insistent on a transfer to a medical center.

On June 22, 2005, Plaintiff was seen by Dr. Finkenbein for a psychiatric evaluation. The psychiatrist found that a recent review and history of Plaintiff's symptoms did not support a diagnosis of bipolar disorder. He recommended Plaintiff follow-up with psychology services. Dr. Warren met with Plaintiff on July 7, 2005 to follow-up on his psychiatric evaluation.

Plaintiff was seen by Dr. Warren on July 14, 2005 for suicide risk assessment. Jail Suicide Assessment Tool was utilized and Plaintiff was found to have neither suicidal thoughts, plans, nor intentions. Plaintiff reported being depressed but Dr. Warren noted that no observed or reported symptoms were present.

Dr. Warren saw Plaintiff again on August 4, 2005, for a routine assessment. Plaintiff was informed of the psychology staff's intent to conduct psychological assessment to better identify what mental health problems he had, if any. He agreed and signed several release forms to permit acquisition of his prior mental health records. Plaintiff demanded that he be permitted to have the raw data from the evaluation. However, due to the inherent need to protect security, it is ill advised to release raw data to patients. As a result, Plaintiff's ultimatum could not be resolved and testing did not take place.

On September 30, 2005, Dr. Hammond noted that Plaintiff was requesting his diagnosis. It was noted that he was argumentative and attempted to distort communication. Dr. Hammond made a note [] to review his records.

Plaintiff was seen by the contract psychiatrist on October 18, 2005. The psychiatrist entered a diagnosis of Mood Disorder, not otherwise specified, and polysubstance abuse and noted that Plaintiff's lithium would likely be reduced at the next follow up in two months.

On November 15, 2005, Staff Psychologist Dr. Jennifer Guriel

[Dr. Tennant][1] noted that psychology staff met with the contract psychiatrist to discuss Plaintiff. The psychiatrist was of the opinion that Plaintiff was not suffering from Bipolar Disorder. Collateral data was collected from institution staff to corroborate the psychiatrist's conclusion. Plaintiff's unit team, work supervisors, and housing unit officers all reported Plaintiff to be sociable and jovial. The psychiatrist and psychology staff concurred to gradually taper Plaintiff off of lithium.

On December 8, 2005, Dr. [Tennant] met with Plaintiff for routine psychiatry clinic monitoring. Plaintiff was unwilling to identify therapy goals or participate in treatment until "we can agree on my diagnosis." Dr. [Tennant] noted her assessment that Plaintiff's observed and reported symptoms did not warrant Bipolar diagnosis.

Plaintiff was again seen by Dr. [Tennant] on January 5, 2006 with similar results. There was no change in diagnosis and Dr. [Tennant] noted that Plaintiff was still prescribed two anti-depressants and "is tapering off of lithium."

Plaintiff was seen by the psychiatrist again on January 24, 2006. The psychiatrist noted Plaintiff was unable to describe symptoms of bipolar disorder, that she did not believe Plaintiff suffered from bipolar disorder, and recommended continuing to decrease Plaintiff's lithium.

Plaintiff was seen by Dr. [Tennant] on February 22, 2006. Plaintiff refused to discuss anything other than why he was not being diagnosed as bipolar. He referred to a forensic study report from FCI Waseca in which he alleged he was diagnosed as bipolar. Dr. [Tennant] explained to him that the bipolar disorder was listed as a "rule out diagnosis," which means that he should be further assessed once he arrived at USP Hazelton to determine the appropriateness of a bipolar diagnosis. Dr. [Tennant] provided Plaintiff with documentation to show that the psychology staff at USP Hazelton had "effectively ruled out Bipolar Disorder." Plaintiff's next scheduled appointment with psychology staff was on March 20, 2006, for which he failed to appear.

---

[1] Dr. Tennant now goes by the name of Dr. Guriel. However, in the pleadings and in plaintiff's medical records, she is known and identified as Dr. Tennant. Therefore, so as not to confuse, the Court will continue to refer to Dr. Guriel as Dr. Tennant for purposes of this Order.

Dr. Hammond met with Plaintiff on April 6, 2006 and noted that Plaintiff is fixated on being diagnosed as bipolar. Dr. Hammond offered to provide counseling to deal with any issues Plaintiff may have and noted that he will continue this course to provide an ongoing assessment for any mood disorder Plaintiff may have and update diagnostic impressions as necessary. Plaintiff was again seen on April 17, 2006 by Dr. [Tennant] to offer counseling.

Dr. [Tennant] again met with Plaintiff on June 14, 2006, to discuss complaints Plaintiff raised in numerous informal remedies to which responses had been delayed due to the volume of requests and limited staff availability as a result of recent institutional lockdowns. Plaintiff again claimed to be bipolar but was consistently observed to be free from symptoms that might warrant such a diagnosis or psychotropic medication. Plaintiff indicated that he no longer wished to be seen by psychology staff because he believed that the sessions were futile. After consultation with Chief Psychologist Dr. Hammond and because Plaintiff did not have any mental health concerns which might have warranted intervention, psychology staff agreed not to schedule Plaintiff for future appointments without his request.

On August 8, 2006, Drs. Hammond, [Tennant], and Warren met with Plaintiff to help identify his issues and treatment needs. Plaintiff continued to argue that he was bipolar and should be placed on lithium. Dr. Hammond noted that he did not doubt Plaintiff has fleeting periods of sadness and emotional ups and downs but he did not believe this was attributable to bipolar disorder. Plaintiff stated that he had no interest in seeing psychology staff any further and was told that, if he changed his mind, to let staff know.

Plaintiff was seen by the contract psychiatrist on September 19, 2006. From August 8, 2006 through December 20, 2006, Plaintiff did not contact psychology staff. On December 20, 2006, Dr. Warren met with Plaintiff. Plaintiff focused the consultation largely on administrative remedies rather than clinical content and stated he no longer needed to be seen by psychology services staff. Dr. Warren noted that Plaintiff did not appear to gain any benefit from consultations because he refused to engage with clinicians in a manner conducive to an ideal assessment. Plaintiff admitted that he refused psychotropic medications recommended by the psychiatrist. Dr. Warren noted a follow-up appointment with the psychiatrist was not necessary at the time since Plaintiff refused to follow Dr.

>Warren's recommendations.
>
>On January 25, 2007, Dr. Warren noted that, at Plaintiff's request, five consent forms had been prepared on his behalf to request Plaintiff's medical records from various mental health facilities; however, the forms could not be submitted because Plaintiff had not signed the releases. Plaintiff transferred institutions prior to signing the releases.
>
>Mr. Jones was transferred from USP Hazelton on January 30, 2007.

See Defendants' Motion to Dismiss or for Summary Judgment (dckt. 65) at 3-6 (citing Defn't Ex. 1, Declaration of Dr. Hammond at ¶ 4).

Upon a review of the plaintiff's medical records, and the affidavits of the plaintiff's treating physicians, the undersigned finds that the defendants have accurately and appropriately depicted the history of the plaintiff's mental health treatment while incarcerated at USP Hazelton. That being said, it is clear that the defendants have not been deliberately indifferent to the plaintiff's mental health needs. The defendants, mental health professionals, saw plaintiff on a regular basis and referred the plaintiff to specialists on more than one occasion. Moreover, the defendants attempted to counsel plaintiff and obtain his prior medical history. However, the plaintiff failed to show for appointments, refused counseling, made unrealistic demands and was generally uncooperative. The defendants did not find that plaintiff had no mental health issues, or that he did not need any medications. Instead, the defendants, and other specialists, found that the plaintiff does not appear to be bipolar and decided, collectively, and in consultation with other specialist, to taper his lithium. The plaintiff believes these actions show that he has been misdiagnosed and mistreated. Thus, the issue in this case is not one of deliberate indifference, but one of medical malpractice. There was clearly no wanton indifference to the plaintiff's medical needs. Rather, the plaintiff simply disagrees

with the diagnosis of medical staff and continues to believe, despite the defendants medical opinions, that he is bipolar and needs lithium. Such claims do not give rise to a cause of action against the defendants in their individual capacities under Bivens. Instead, these issues are more appropriately addressed under the Federal Tort Claims Act. However, the plaintiff has not named the United States as a defendant, nor has he provided proof that he exhausted such a claim by filing an administrative tort claim [a Claim for Injury, Damages or Death] with the Bureau of Prisons. See 28 U.S.C. § 1346(b)(1); see also 28 U.S.C. § 2401(b).

Furthermore, with regard to Dr. Tennant, even if the plaintiff were entitled to recover damages against the defendants under Bivens, Dr. Tennant, as a public health officer, is immune from liability in her individual capacity. See Defn't Ex. 3, Declaration of Dr. Jennifer Guriel [Tennant], at ¶ 2. Constitutional claims against federal employees in their individual capacities are subject to the limitations of judicial authority. In Carlson v. Green, 446 U.S. 14 (1980), the Supreme Court found two instances in which a Bivens action cannot be maintained. First, when there are "special factors counseling hesitation in the absence of affirmative action by Congress." Carlson at 18. Second, when "Congress has provided an alternative remedy which is explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective." Id. at 18-19 (emphasis in original).

With regard to Public Health Officers, Congress has explicitly stated that the exclusive remedy for personal injury resulting from the medical decision of a commissioned officer of the Public Health Service while acting within the scope of his employment is against the United States under the FTCA. See 42 U.S.C. §233(a) ("The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where

the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental or related function . . . by any commissioned officer of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.).  Therefore, claims against public health officers cannot be maintained under Bivens.

Because Dr. Tennant was a public health official employed by the BOP at the time of the alleged events, the plaintiff cannot maintain this Bivens action against Dr. Tennant.

**B.  Plaintiff's Claims for Injunctive Relief**

The standard for granting injunctive relief in this Court is the balancing-of-hardship analysis set forth in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir. 1977).  In making this analysis, the Court must consider the following four factors:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
>
> (2) the likelihood of harm to the defendant if the requested relief is granted,
>
> (3) the likelihood that the plaintiff will succeed on the merits, and
>
> (4) the public interest.

Direx Israel, Ltd v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted).  The "[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction." Id. (citation omitted).

A court will not grant a preliminary injunction unless the plaintiff first makes a "clear showing" that he will suffer irreparable injury without it.  Id.  The required harm "must be neither

13

remote nor speculative, but actual and imminent." Id. (citations and internal quotation omitted). If such harm is demonstrated, the court must balance the likelihood of harm to the plaintiff if an injunction is not granted and the likelihood of harm to the defendant if it is granted. Id. (citation omitted). If the balance of those two factors "'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991) (citations omitted). However, "[a]s the balance tips away from the plaintiff, a stronger showing on the merits is required." Id. (citation omitted).

Regardless of the harm that may occur to either the plaintiff or defendant, the Court does not have the authority to grant plaintiff the injunctive relief he seeks. The plaintiff seeks an injunction that directs the BOP to transfer him to a specific federal medical facility. However, the transfer of a convicted and sentenced inmate is within the sound discretion of the BOP. See Meachum v. Fano, 427 U.S. 215 (1976); see also, 18 U.S.C. § 3621(b) (the BOP shall designate the place of an inmate's confinement). Accordingly, the plaintiff cannot succeed on the merits of this claim and injunctive relief should be denied.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the defendants' Motion to Dismiss or for Summary Judgment (dckt. 64) be **GRANTED** and that the plaintiff's alleged Bivens claims against the defendants be **DISMISSED with prejudice** from the active docket of the Court.

Within ten (10) days after being served with a copy of this recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to

which objection is made and the basis for such objections. A copy of any objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Opinion/Report and Recommendation to the *pro se* petitioner by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record via electronic means.

DATED: October 16, 2008.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE